**UNITED STATES of America**

v.

**James Pickens DAVIS, Jr.**

**Nos. 12196, 12197.**

United States District Court
E. D. Tennessee, S. D.

Nov. 7, 1966.

J. H. Reddy, U. S. Atty., John H. Cary, Asst. U. S. Atty., Thomas A. Williams, Asst. U. S. Atty., Chattanooga, Tenn., for plaintiff.

Wilkes T. Thrasher, Jr., Ward Crutchfield, Chattanooga, Tenn., for defendant.

## OPINION

**FRANK W. WILSON, District Judge.**

This case is before the Court upon defendant's motion for new trial in the above-captioned cases. Grounds for this motion are alleged as follows: (1) That there is no evidence to sustain the verdict of the jury, (2) that the Court erred in failing to grant a mistrial following the testimony of Dr. Robert Demos, (3) that the Court erred in withholding a ruling upon defendant's motion for mistrial until after all proof was in, (4) that the Court erred in refusing to allow defendant to conduct his own defense, (5) that the Court erred in forcing defendant to be represented by Court-appointed counsel, (6) that the Court erred in failing to grant a mistrial after the summation of the United States Attorney, and (7) that the Court erred in failing to instruct the jury upon the "Durham rule" of insanity.

█ The Court is of the opinion that there is ample evidence to support the verdicts of the jury and that defendant's first ground is without merit.

Defendant next contends that the Court erred in failing and refusing to grant his motion for mistrial following the testimony of Dr. Demos. Defendant contends that Dr. Demos, the victim of the kidnapping charged in case number 12,-197, dramatically and emotionally stood at the witness box and pointed his finger at the jury, avowing that he would hold each of them responsible if defendant were released and any harm came to Demos' family as a result, and that this event was highly prejudicial to defendant and not capable of being cured by action of the Court. Near the close of Dr. Demos' testimony, the following took place:

"Mr. Thrasher: 'Just one question. Based and predicated upon all of which you have stated, and all of the information which you have, with this defendant and under the most trying circumstances, and your opportunity to be with him, psychoanalyze him and study him, learn his emotions, and so forth, as a doctor then who is properly qualified, are you of the opinion that he needs punishment or treatment in his present condition?

"Mr. Cary: Objection, your Honor; that invades the province of the jury * * *

"The Court: Sustain the objection. Disregard the question and answer. All right; anything further? As I understand, Dr. Demos will be excused at this time unless you should desire to recall him tomorrow.

"Mr. Thrasher: We want to reserve the right to recall him.

"Dr. Demos: Could I make a statement that has not—

"The Court: No, Sir; Doctor, it would be necessary to respond to such a question.

"Dr. Demos: Regardless if it meant my life—

"The Court: I think that is a matter you could talk to the attorneys about first before mentioning it.

"Mr. Thrasher: I would like one question. Doctor, do you feel that your life is at stake, that it's involved; do you feel that your life is in jeopardy?

"Dr. Demos: I think this; I think that if Mr. Davis is let go free, that I hope my best friend, if he ever came to my house and injured me or my wife, which I don't think he would do in a normal state, but in an agitated state he might, because my wife treated him kindly. But I would be in fear of my life and my family's, yes, siree, one hundred per cent, and I would hold them responsible for the death of anybody in my family if he is not treated.

"Mr. Thrasher: If he is not treated. In other words, you and I concur that the man should have, if I understand you correctly, psychiatric treatment, not just psychiatric evaluation.

"Mr. Cary: Now may I say, may it please the Court, it's for the jury to determine whether this man is guilty or not; the Court will determine what is to be done with him.

"Mr. Thrasher: Your Honor, I just asked him whether or not in his opinion he should have psychiatric evaluation or psychiatric treatment; certainly the man is a doctor and he—

"The Court: Well, I believe that that is not an issue for trial in this particular proceeding. Sustain the objection; disregard the question and answer.

"Mr. Thrasher: Your Honor, in view of the type of statement made, I think it imperative that we probe further into this rather than to leave this statement hanging in midair, because it's obvious that the doctor's sentiment has been expressed; the jury has heard it; then we should know why he is professionally making this statement. And I beg leave of the Court to ask additional questions.

"The Court: Well, state your question; I'll have to rule on your questions as they are asked, Mr. Thrasher.

"Mr. Thrasher: All right, Sir. I'll ask you, Doctor, with your observation of this defendant, your retiring with him, and your opportunity to study him under the most trying of circumstances, whether it is your opinion that the man needs psychiatric treatment or not today?

"Dr. Demos: Definitely he needs psychiatric treatment; yes, Sir.

"Mr. Thrasher: Is it your position, then, that the jury should not give him psychiatric evaluation and treatment—

"Mr. Cary: Object; the jury doesn't give him anything. The Court will give him—

"Dr. Demos: The point is, that the man should not just be put out on this earth because it would be bad for him and it would be bad for everyone. I was hoping regardless of what happened that it would be one positive statement; I don't want to see this man go to jail; that would be the worst thing in the world; I want to see him sent to a place where he will be treated, if it takes two years or twenty-five years.

"Mr. Thrasher: Now, I know that you personally, knowing that you are a compassionate man. What would this man's prognosis be as far as recovery from the mental illness that you have correctly diagnosed he has, if he were sent to a penitentiary instead of a hospital; what would his prognosis be without treatment?

"Mr. Cary: Objection, Your Honor.

"The Court: Sustain the objection.

"Dr. Demos: Even under treatment, it is going to take a long time.

"Mr. Cary: Objection."

At this point the witness was excused. After brief testimony from two other prosecution witnesses, the jury was excused for the day. At this point, the defendant moved for a mistrial based upon the above-quoted testimony of Dr. Demos. The Court took the motion under advisement. When the jury returned the following morning, the Court instructed the jury as follows:

"At the conclusion of his testimony last evening, the witness, Dr. Demos, in response to a question from defense counsel, made a statement in regard to his own apprehensions and in regard to the responsibility of the jury for securing medical treatment for Mr. Davis. You are instructed that the testimony of Dr. Demos is wholly irrelevant to any issue for decision by this jury and you will totally disregard it in making your decision and in arriving at any verdict in the case. Under the law the jury would have no responsibility for the disposition of Mr. Davis following any verdict, either that of 'not guilty' or that of 'guilty'. The sole responsibility for any disposition of Mr. Davis following a verdict is by law imposed upon this Court and you will not be required or expected in any way to concern yourself with that in rendering your verdict. Accordingly, Dr. Demos' statements with regard to any apprehensions he may have and with regard to any responsibility of

this jury for securing medical treatment for Mr. Davis were improper and wholly irrelevant to any issue for decision by this jury. You are accordingly instructed to totally disregard such testimony and not allow it in any way to enter into your deliberations or in any manner to influence you in arriving at a verdict in this case."

Similar language was included in the Court's charge to the jury at the close of argument, just prior to the submission of the case to the jury. After receiving the verdict of the jury that defendant was guilty as charged in each indictment, the Court attempted to ascertain what effect, if any, the statements made by Dr. Demos may have had upon the deliberations and verdict:

"The Court: Ladies and gentlemen, did or did not the testimony of Dr. Demos as to his alleged fears for himself or his family if the defendant were released enter into any part of your deliberations?

"Foreman: It was not a part of our deliberations; it was not discussed by us at all; the doctor did not influence the jury either way at all.

"The Court: Let me inquire this, of each individual juror: Did it influence any juror in any manner in arriving at his or her decision? May I have the roll called and your individual response to that question?

"Whereupon the Clerk called each individual juror by name, separately, viz:

"The Court: Did this testimony of Dr. Demos in any way influence you in arriving at your decision in this case?

Juror Jessie Rowe: No, not at all.

Juror Herbert E. Grennough: No, Sir.

Juror Mary Francis Eubanks: No, Sir.

Juror L. J. Radcliff: No, Sir.

Juror William G. Dotson: No, Sir.

Juror Wes Shamblin: No, Sir.

Juror John J. Heiskell: No, Sir.

Juror George F. Huey: No, Sir.

Juror Ralph R. McCulley: No, Sir.

Juror Sylvester Harris: No, Sir.

Juror Silas M. Robertson: No.

Juror Henry Myers: No, Sir.

The Court: Now, ladies and gentlemen, let me ask one further question of you. Did or did not the testimony of Dr. Demos to the effect that he would hold the jury responsible should the defendant be released without treatment form any part of the deliberations of this jury? Was that testimony in any way a part of your deliberations? Do you understand my inquiry?

"Foreman: Yes, Sir, I do, and it was not.

"The Court: All right, let me ask each one of you individually then whether or not that testimony of Dr. Demos as to his holding the jury responsible should the defendant be released without treatment—did that in any way influence you as a juror in making your decision in the verdict in this case? Will you call the roll of jurors and have the jurors respond to that question?

Juror Jessie Rowe: No, Sir.

Juror Herbert H. Grennough: No, Sir.

Juror Mary Francis Eubanks: No, Sir.

Juror L. J. Radcliff: No, Sir.

Juror William G. Dotson: No, Sir.

Juror Wes Shamblin: No, Sir.

Juror John Clay Heiskell: No, Sir.

Juror George F. Huey: No, Sir.

Juror Ralph R. McCulley: No, Sir.

Juror Sylvester Harris: No, Sir.

Juror Henry Myers: No, Sir.

Juror Silas M. Robertson: No, Sir."

One of defendant's attorneys, Wilkes T. Thrasher, Jr., states in an affidavit attached to defendant's motion for new trial that, in news interviews and in interviews with defense counsel prior to trial, Dr. Demos had never indicated that he had any fears with respect to the safety of his family, but on the contrary the witness had stated publicly that he was not afraid of defendant and that defend-

ant should not be jailed but should be hospitalized. Mr. Thrasher further states that he heard only a part of the colloquy between Dr. Demos and the Court immediately preceding the testimony in question and expected Dr. Demos to testify, consistent with his prior statements, that he was not afraid of defendant, and further that the statements which were made by the witness were a shock and surprise to defense counsel. Defendant also advances, in support of this ground for new trial, copies of certain articles appearing in *The Chattanooga Times* shortly after the offenses were committed in which Dr. Demos is quoted as having no fear of defendant.

■■ Of course, the statements made by the witness, Dr. Demos, were improper, and it is unfortunate that they were injected into the trial. It is important to examine carefully the impact which the statements may have had upon the trial of defendant, for, as was said by Chief Justice Warren in the course of the opinion in Coppedge v. United States, (1962) 369 U.S. 438, 449, 82 S.Ct. 917, 923, 8 L.Ed.2d 21:

> "When society acts to deprive one of its members of his life, liberty or property, it takes its most awesome steps. No general respect for, nor adherence to, the law as a whole can well be expected without judicial recognition of the paramount need for prompt, eminently fair and sober criminal law procedures. The methods we employ in the enforcement of our criminal law have aptly been called the measures by which the quality of our civilization may be judged."

But the mere fact that the statements were made or that they were improper does not necessarily require a new trial. In Lutwak v. United States, (1958) 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593, the Supreme Court noted that:

> "A defendant is entitled to a fair trial but not a perfect one."

Thus, the essential inquiry is whether the statements of the witness in the context in which they were made and in the light of the Court's instructions to the jury deprived the defendant of a fair trial.

There is authority that remarks of witnesses may be so prejudicial as to constitute reversible error. Thus, in Scott v. United States, (C.A.5, 1959) 263 F.2d 398, a mail fraud prosecution, a witness testified as to a conversation involving the defendant in which defendant was told he should be "ashamed of the way you are dealing with these people" and replied, "These people care nothing about me, and I care nothing about them", but this conversation was never connected with the offense charged. The Court held such testimony so inflammatory and prejudicial that no amount of cautionary instruction could eradicate its impression from the minds of the jury. See also United States v. Perlstein, (C.A.3, 1941) 120 F.2d 276. However, in the latter case, the trial court had refused to give a cautionary instruction limiting the testimony to those defendants as to whom it was relevant.

This is an important distinction, for it has generally been held that a mistrial is not warranted on the ground of conduct and testimony of witnesses where improper testimony has been stricken by the trial court and appropriate instructions given the jury to disregard the same. See the cases collected at footnote 19.95, 23A C.J.S. Criminal Law § 1384, p. 1029 and in the 1966 supplement to that volume. In United States v. Lubertazzi, (C.A.3, 1960) 283 F.2d 152, a prosecution under the Dyer Act, a prosecution witness was asked to determine the authenticity of certain indicia of automobile ownership, whereupon he responded: "These are authentic New Jersey certificates of ownership. However they were stolen at gunpoint." The Court admonished the witness to be responsive to the question, and after motion for mistrial, instructed the jury to disregard the addendum concerning robbery. The appellate court lauded the manner in which this "minor untoward incident" was handled by the trial court and held it no abuse of discretion to deny

the mistrial. To the same effect, see Aeby v. United States, (C.A.5, 1953) 206 F.2d 296 (witness stated that defendant "had let women take the rap for him before"); Herman v. United States, (C.A.4, 1955) 220 F.2d 219 (witness stated that defendant charged with interstate transportation of stolen jewelry had taken dope on occasions); Reistroffer v. United States, (C.A.8, 1958) 258 F.2d 379 (witness testified that he had told defendant over the telephone, "I says, you are nothing but a damn exconvict"); White v. United States, (C.A. 4, 1960) 279 F.2d 740 (witness testified that he knew defendant very well and had "served time with him in the Training School for Boys"); Straight v. United States, (C.A.9, 1959) 263 F.2d 811 (prosecutrix in rape case testified that she had first told the details of the offense to "the lie detective man"); United States v. Vita, (C.A.2, 1961) 294 F.2d 524 (co-defendant implicated defendant in narcotics and another bank robbery); and United States v. Hall, (C.A.4, 1965) 342 F.2d 849 (witness indicated defendant involved in jury tampering prior to a trial in state court). In the case of Claunch v. United States, (C.A.5, 1946) 155 F.2d 261, a witness stated that he had been warned by an anonymous telephone caller that defendant had served in the penitentiary for murder and to "take it pretty easy" when he testified. The trial court immediately excluded the remark and instructed the jury to disregard it completely. Failure to grant a mistrial was held not to be error, but in that case there was no motion for mistrial, which weakens that case considerably as authority in the instant situation.

In many criminal cases, manifestations of grief or other emotion by the victim or the family of the victim have served as the basis for motions for mistrial. A number of these cases are reviewed in the annotation appearing at 46 A.L.R.2d 949, and at 4 A.L.R.2d Later Case Service 1144. In some of the cases prejudice was found, where the outbursts were violent or aggravated, or where the trial judge failed to take curative action, or where the offender was neither admonished nor removed and the conduct persisted. On the other hand, no prejudice was found in cases where the conduct was not prolonged or obviously inflammatory, and proper curative action was taken by the Court, even though these cases involved various degrees of weeping, and even hysteria. The annotator made the following remarks at 46 A.L.R.2d 951:

"* * * while the mere fact that an emotional outburst has occurred will not ordinarily require the trial judge to declare a mistrial or influence the appellate court in reversing a decision against an accused and granting a new trial, whether the trial judge has acted seasonably to control the situation and to dispel any bias or prejudice which might have resulted may well be determinative of the question. It may be, however, that the grief or emotion manifested was of such character that it was impossible for the court, acting quickly and authoritatively, to erase the bias and prejudice aroused in the jury against the accused.

\*　　\*　　\*　　\*　　\*　　\*

"Recognizing the principles already enumerated, the greater number of courts have upheld the trial court's discretion in either failing or refusing to grant a mistrial or to take other action following an incident which involved manifestations of grief, crying, or the like by the victim or family of the victim during the criminal trial. This was because the appellate court determined that the incident was not itself of such a nature as to have been prejudicial, or because of the prompt action of the judge in suppressing it or lessening its impact by proper instructions to the jury.

"Where the trial judge does take immediate steps to suppress the disturbance, therefore, and in addition properly instructs the jury to disregard the incident, the appellate courts will generally uphold its decision."

■ Viewed in its context, the witness' statement was not so prejudicial as to require a new trial. It was very brief, and was not accompanied by emphatic histrionics. The witness was standing at the time the statements in question were made, but the occasion for this was his preparation to leave the witness stand at what was thought to be the conclusion of his testimony in the case. The Court had just denied the witness' request to make an unsolicited statement, whereupon defense counsel solicited the statement. During the course of his answer to the first of defense counsel's questions upon this phase of his testimony, the witness did gesture once in the direction of the jury, to indicate who he meant by the word "them", but such gesture was not threatening or exaggerated. While the witness in the course of the portion of his examination set out above did indicate concern that defendant not be released without treatment, he subsequently stated that he thought it would be the "worst thing in the world" for defendant to go to jail. In this context, and in the light of the Court's purgative instructions, the Court is of the opinion that the statements of Dr. Demos were not so prejudicial as to require a new trial. It might also be noted in this regard that there is no showing that government attorneys invited or precipitated the witness' remarks. Rather, this untoward statement was elicited by counsel for defendant. That counsel may have misunderstood the nature of the witness' remarks to the Court prior to the incident in question or that counsel may have guessed wrong as to the nature of the message that burdened Dr. Demos at that particular point cannot alter the fact that the statement was brought out by the defense. It might also be noted in this connection that the United States attorney had interposed an objection to the question propounded by defense counsel immediately before the witness prepared to leave the stand, which question was similar in character to that which sparked the allegedly prejudicial statement, and the United States attorney continued to object to the line of questioning pursued by defense counsel. Finally, there is no indication that the improper testimony formed any part of the jury's deliberations or that it influenced any of them in his or her decision upon the verdicts. To the contrary, each juror stated in open court that the testimony in question did not influence him or her in arriving at the verdicts.

Thus, the Court is of the opinion that the improper testimony was not of such prejudicial nature as to require a new trial, and that any effect it might have had upon the jury was alleviated by the Court's instructions upon the subject, as is borne out by the responses of the jurors to the Court's inquiries after the return of the verdicts in these cases. In the case of United States v. Haskins, (C.A.6, 1965) 345 F.2d 111, the Court of Appeals for this Circuit, said:

"It is the general rule that cautionary instructions to a jury to disregard inadmissible evidence, which has been stricken from the record, or to disregard improper and prejudicial questions or arguments are deemed to cure such errors." (Authorities omitted.)

"There are of course exceptions to this rule. In Kotteakos v. United States, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946) the Supreme Court noted the general rule:

" 'If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. * * *'

"and then stated:

" 'But if one cannot say, with fair assurance, after pondering all that happened, without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart

from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.' (Citation and footnote omitted.)"

Applying these principles, the Court holds that the testimony here challenged was not of such an exceptionally prejudicial character that its withdrawal from the consideration of the jury, with appropriate instructions, could not remove whatever harmful effect that may have been caused by its injection into the trial. United States v. Farber, (C.A.6, 1964) 336 F.2d 586. Accordingly, defendant's second ground for new trial is held to be without merit.

Defendant's next contention is that the Court erred in withholding action upon defendant's motion for mistrial until all proof was in, thereby precluding defendant from obtaining and offering testimony in rebuttal to the challenged testimony of Dr. Demos.

The Court did reserve final action upon the defendant's motion for mistrial until completion of the trial. The purpose of this was to permit the Court to better judge the possible prejudicial effect of the objectionable testimony in the light of all of the record and after proper exclusionary and cautionary instructions were given by the Court and after the Court had the benefit of a poll of the jury following the verdict. The defendant could scarcely have been misled or prejudiced by the procedure as he was immediately aware that the Court had not granted the motion for mistrial but rather had given instructions to the jury to disregard the testimony.

■ Defendant took no exception to the Court's action in this regard. Moreover, there was no indication by the defendant of any desire to have the proof re-opened for any purpose. Defendant having failed to apprise the Court of any such desire, he cannot now be heard to complain on this ground. Counsel for defendant, in his brief in support of the present motion, contends that "the court's refusal to act one way or the other and the court's statement, 'Let's move along' thusly deprived the defendant of the right of further appropriate cross-examination". The Court sees no merit in this argument. No action or lack of action upon the part of the Court was intended to blunt, or had any noticeable effect of blunting the commendable zeal with which counsel for both sides pursued their respective causes.

The Court is of the opinion that defendant's third ground advanced in support of his prayer for new trial is without merit and should accordingly be denied.

Defendant's fourth ground for new trial is that the Court erred in refusing defendant's request to conduct his own defense unassisted by counsel.

In this regard, a review of the record in this case will reflect that the defendant first appeared before this Court upon March 29, 1965, within three days after the offenses of bank robbery and kidnaping were alleged to have been committed. At that time he requested that the Court appoint Ward Crutchfield, a longtime friend and duly licensed attorney, as his counsel in the case, the defendant having no means to employ counsel. The Court complied with the defendant's request in this regard and appointed Mr. Crutchfield. Mr. Crutchfield in turn requested that he be permitted to associate Henry Grady, a former assistant states attorney for Hamilton County, Tennessee, and this appointment was likewise made by the Court. Thereafter, a hearing was held upon June 3, 1965, upon the issue of the defendant's mental competency to assist his counsel in his defense. The Court concluded upon the testimony of the examining phychiatrist that the defendant was not capable of properly assisting his counsel and he was thereupon committed for treatment as provided by law. A further hearing upon the same issue was held by the Court upon November 17, 1965, at which time the Court concluded that the defendant was competent to stand trial and the trial was set for De-

cember 15, 1965. Upon December 9, 1965, just six days prior to the trial, the defendant first requested the Court to discharge his attorneys, Mr. Crutchfield and Mr. Grady, and to appoint in their stead Wilkes Thrasher, who is also an attorney duly admitted to practice before this Court. The Court declined to discharge Mr. Crutchfield and Mr. Grady, believing that no proper grounds existed for such action, but did request Mr. Thrasher to assist in the trial, which he agreed to do. On appearing for trial upon December 15, 1965, the defendant again moved to discharge his attorneys, Mr. Crutchfield and Mr. Grady. At this stage of the proceedings the Court declined to do so, whereupon the defendant refused to further participate with them at the trial of his case. It then became necessary to continue the trial and to conduct further hearings with respect to the defendant's competency to stand trial. As a result of these hearings, the Court again concluded that the defendant was not competent to assist his counsel or to stand trial and again ordered that he be committed for treatment. At this stage of the case an appeal was taken, resulting in the Court of Appeals affirming the action of this Court in declining to discharge Court-appointed counsel and in committing the defendant for mental treatment. United States v. Davis, 6 Cir., 365 F.2d 251 (decided August 16, 1966). Thereafter, at a time when it was felt no prejudice could result to the defendant by reason of pending proceedings, the Court complied with the defendant's request to release Mr. Grady as his counsel, leaving the defendant represented by Mr. Crutchfield and Mr. Thrasher, both of whom had been appointed by the Court at the personal request of Mr. Davis. Upon July 25, 1966, a further hearing was held upon the competency of Mr. Davis to stand trial, resulting in a trial being set upon September 13, 1966. Upon the morning of the trial the defendant's attorneys announced that they were prepared for trial, but the defendant moved that both Mr. Crutchfield and Mr. Thrasher be discharged as his attorneys and moved that the trial be continued to permit him to employ other counsel. In addition, the defendant made the following request of the Court:

"Well, one motion I have had for some time, Your Honor, is a ruling on whether I be allowed, if I so desired, to exercise my constitutional right to defend myself; that is not to say that I am going to insist upon my defending myself; I just want a ruling whether I could if I so desired, either to defend myself or assist my counsel in my defense. As I say, I am not saying I intend to exercise this right."

The Court denied the request of the defendant to discharge his Court-appointed counsel, denied his request for a continuance, and denied his somewhat equivocal request to be allowed to proceed without the assistance of counsel. The case then proceeded to trial. A further request was made by defendant, in the course of the cross-examination of the witness, Dr. Weizenhardt, to be permitted to participate in the cross-examination of the witness in addition to the cross-examination conducted by his counsel. This request was denied.

It should be noted that throughout all of the proceedings in this case, the defendant has at all times, other than in the presence of the jury, been afforded the opportunity by the Court of making any statement or representation in his own behalf which he may have desired to make.

The right to conduct one's own defense is a right which has long been recognized in American jurisprudence. Section 1654 of Title 28, United States Code, provides as follows:

"In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."

The ancestor of this code provision, in language almost identical with the above, was enacted by the First Congress as

Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92 (1789) and was signed into law by President Washington one day before the same Congress proposed what came to be the Sixth Amendment to the Constitution of the United States. The Supreme Court has indicated that the right to have assistance of counsel carries with it the correlative right to dispense with counsel and defend *pro se*. Adams v. United States ex rel. McCann, (1942) 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268; Price v. Johnston, (1948) 334 U.S. 266, 68 S.Ct. 1049, 92 L.Ed. 1356. From the language of these opinions, some Circuit Courts of Appeals have deduced that the right to defend *pro se* is constitutionally protected. See Juelich v. United States, (C.A.5, 1965) 342 F.2d 29; MacKenna v. Ellis, (C.A.5, 1959) 263 F.2d 35; and United States v. Plattner, (C.A.2, 1964) 330 F.2d 271, in which case it was said:

"* * * we hold the right to act *pro se* as above stated is a right arising out of the Federal Constitution and not the mere product of legislation or judicial decision. Thus we would be required to remand the case, even if no prejudice to Plattner were shown to have resulted from the refusal to permit him to act *pro se*."

The validity of the deduction that the right to defend oneself without the assistance of counsel is a constitutional right is questionable. All that has really been said by the Supreme Court is that the Sixth Amendment does not *prohibit* the right of self-representation. See Adams v. United States ex rel. McCann, supra; Carter v. People of State of Illinois, (1946) 329 U.S. 173, 67 S.Ct. 216, 91 L.Ed. 172; and United States v. Johnson, (C.A.6, 1964) 333 F.2d 1004. Other courts have held that the right to defend pro se is not constitutional, but only statutory. Brown v. United States, (1959) 105 U.S.App.D.C. 77, 264 F.2d 363 and United States v. Bentvena, (C.A.2, 1963) 319 F.2d 916 at 937, cert. den. 375 U.S. 940, 11 L.Ed.2d 271, 272, 84 S.Ct. 345, 346, 353, 354, 355, 360.

It has also been said that the right to conduct one's own defense in a criminal case is absolute. United States v. Plattner, supra; United States v. Bentvena, supra; United States ex rel. Maldonado v. Denno, (D.C.N.Y., 1965) 239 F.Supp. 851. In the latter case, it was said:

"So basic is this right of a prisoner to conduct his own defense that even in insanity hearings to determine the legal responsibility of prisoners for their acts, the courts of New York have held that defendants have an absolute right to argue their own defense."

However, the Court is of the opinion that the view expressed in the *Denno* case is an extreme one. The right to defend *pro se* cannot be isolated from other elements of fair orderly administration of justice. In this sense it cannot be called "absolute". Even in the *Plattner* decision, qualifications upon the right to defend *pro se* were recognized:

"The right to counsel and the right to defend *pro se* in criminal cases form a single, inseparable bundle of rights, two fases (sic) of the same coin. * *

"Accordingly, in all cases of this type, no matter how the indigent or other defendant may phrase his prayer for action by the Court, it is incumbent upon the presiding judge, by recorded colloquy with the defendant, to explain * * * that he has the choice between defense by a lawyer and defense *pro se* * * * If the result is a waiver of the right to counsel and an election to defend *pro se*, the presiding judge should conduct some sort of inquiry bearing upon the defendant's capacity to make an intelligent choice."

Likewise, in United States v. Bentvena, supra, the right to defend *pro se* was termed "absolute" but was made subject to the qualification that once the trial reached an advanced stage grant or refusal of the right was within the discretion of the trial judge. See also Johnson v. United States, (C.A.8, 1963) 318 F.2d 855, and 77 A.L.R.2d 1238. In the

same manner, it has been said that the right to defend pro se may be denied when allowance of such right would disrupt the proceedings. United States v. Private Brands, Inc., (C.A.2, 1957) 250 F.2d 554; United States v. Mitchell, (C.A.2, 1943) 138 F.2d 831; Overholser v. De Marcos, (1945) 80 U.S.App.D.C. 91, 149 F.2d 23, cert. den. 325 U.S. 889, 65 S.Ct. 1579, 89 L.Ed. 2002.

■ In the light of the foregoing authorities, whether it be said that the right to defend *pro se,* is constitutional, or merely statutory, it is clear that the right is not absolute, but is qualified, and may be denied under some circumstances.

Under the facts of the instant case, four inquiries cannot be avoided: (1) whether the defendant made a timely and unequivocal request to defend himself without the assistance of counsel; (2) whether defendant was capable of knowingly and intelligently waiving the right to counsel; (3) whether defendant's exercise of the right to defend *pro se* would have disrupted the proceedings; and (4) whether defendant suffered any prejudice from the denial of the right to defend *pro se.*

With regard to the first inquiry as stated above, the Court is of the opinion that the record does not clearly reflect that the defendant ever made an unequivocal request to defend himself and to dispense with the assistance of all counsel rather, his requests in this regard were always couched in terms of his desire to discharge his present counsel and replace them with other counsel or to be permitted to participate through counsel or in person as he might from time to time elect. Even upon the morning of the trial his request to defend himself was coupled with a motion to be allowed to discharge his Court-appointed attorneys and to continue the case to permit him to employ other counsel. Such tactics, if indiscriminately permitted, could prevent a case from ever going to trial.

A second inquiry is whether the defendant was capable of knowingly and intelligently waiving his right to counsel.

In the recent case of United States v. Johnson, (C.A.6, 1964) 333 F.2d 1004, the Court said:

"* * * it is well settled that such a defendant may waive his right to representation by counsel if he knows what he is doing and his choice is made with eyes open."

In United States v. Redfield, (D.C.Nev., 1961) 197 F.Supp. 559, affirmed at 9 Cir., 295 F.2d 249, the Court discussed at some length the factors to be considered in determining whether the accused had made a valid waiver of the right to be represented by counsel. Among the factors discussed were accused's background as a successful financier, his understanding of the charges and proceedings, as shown by his demand for a bill of particulars, his calmness and deliberation, his alertness, courteousness and determination, the fact that he had represented himself in an action against him by the SEC and in another action, the fact that he had at one time served upon a federal grand jury, and various psychiatric testimony. One of the fundamental questions noted by the Court was:

"* * * whether defendant knew what he was getting into. Did he appreciate that any law suit is complicated, at least to a layman, and that a criminal charge is a matter not to be dealt with lightly?"

In Woolard v. United States, (C.A.5, 1949) 178 F.2d 84, the Court quoted Johnson v. Zerbst, (1938) 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1462, for the following language:

"'The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'"

■ In this case, the defendant is a college graduate, having a bachelor's degree from the University of Chattanooga, with a major in business administration.

He has an agile mind, and is articulate. However, prior to the trial, and at the time of the trial, there was considerable evidence that defendant was at least emotionally disturbed. Without attempting a detailed summary of the medical evidence filed in this case prior to trial, it should be pointed out that all the psychiatrists who had occasion to examine and evaluate defendant agreed that he was suffering from a mental illness. There was a difference of opinion among the psychiatrists as to whether he was mentally competent to understand the nature and significance of the charges against him. It was generally agreed that defendant's disturbance took the form of a schizophrenic reaction, paranoid type, manifested by inappropriate thinking, grandiose delusions, etc. It is important to note that defendant's difficulties in thought process are not so much with factual recall and description, indeed he seems above average in his ability to recall and detail specific events. Rather, defendant's mental problems center about the interpretive, the analytical, the thought processes requiring the exercise of judgment. It is for this reason that the Court is not swayed by defendant's argument that if he were not mentally competent to defend himself, then he likewise would not be mentally competent to stand trial. An important factor in capacity to be tried is the defendant's mental ability to render his counsel such assistance as to make possible a proper defense. The defendant's ability to recall events so that he can furnish facts to his counsel is sometimes stressed. 21 Am.Jur.2d 145, "Criminal Law", 63. On the other hand, it is vital to defense *pro se*, that one be able to recognize proper defenses and evidence to support them and to be able to discard the irrelevant. The distinction between capacity to stand trial and capacity to defend *pro se* has been recognized by the Supreme Court. In the case of Massey v. Moore, (1954) 348 U.S. 105, 75 S.Ct. 145, 99 L.Ed. 135, the Court held:

"One might not be insane in the sense of being incapable of standing trial and yet lack the capacity to stand trial without benefit of counsel."

Further, the defense in the instant case was that of temporary insanity. There was little if any dispute as to the acts constituting the offenses with which defendant was charged. Although defendant's plea was temporary insanity, such a defense has overtones of mental illness which might carry into the time of trial. It is appropriate to note the remark of Justice Douglas in Massey v. Moore, supra, that:

"If he is insane, his need of a lawyer to tender the defense is too plain for argument."

though that case was concerned with allegations of insanity at the time of trial. Of course, the evidence in the instant case raised an issue as to defendant's mental capacity at the time of trial, as witnessed by the three hearings held upon that issue. The Court is of the opinion that defendant, although having the capacity to stand trial, was not capable of representing himself and conducting his own defense.

Turning to the third question posed above, the Court is further of the opinion that if defendant had been allowed to conduct his own defense, his conduct would have disrupted the trial. Upon every occasion when defendant was afforded an opportunity to speak in his behalf, he delved into subject matter whose relevance to the proceeding was often obscure and irrelevant.

Finally, the Court is of the opinion that defendant suffered no prejudice by virtue of his representation by Court-appointed counsel. Each of the gentlemen who represented defendant, Wilkes T. Thrasher, Jr. and Ward Crutchfield, is an able and articulate attorney, experienced in the trial of criminal cases. Each has practiced for many years in this county and is held in high esteem both professionally and personally in the community. They have represented the defendant capably and competently and with utmost fidelity throughout the trial of this case. It cannot be said that defendant could have rep-

resented himself more ably had he been allowed to do so. Insofar as compatible with their professional obligations, these gentlemen tried the case in accordance with the wishes of defendant.

In summary, then, the Court is of the opinion that the fourth ground advanced by defendant in his motion is without merit.

Turning next to defendant's fifth ground, the Court is likewise of the opinion that it is without merit. Defendant contends that the Court erred in forcing him to trial with his two Court-appointed attorneys. Much of the same reasoning set out with regard to defendant's fourth ground is applicable here.

■ Defendant, in his sixth ground, contends that the Court erred in refusing to grant a mistrial when it is alleged that the United States Attorney stated to the jury in the course of his summation that counsel representing defendant were Court-appointed. The defendant made no objection at the time of the alleged prejudicial argument. In fact, no such objection was made until after all arguments had been completed, the Court had charged the jury, and the jury had retired to consider its verdict. The Court has no recollection of any such argument having been made and a search of the transcript of the closing argument of Government's counsel does not reveal any such argument. The only reference that appears to have been made in the closing argument of Government's counsel to counsel for the defendant was as follows:

> "One fact that we can all agree on is that Mr. Davis is certainly represented by adequate counsel. Nobody will question that. And they made the most of the facts, but they can't change the facts. They can't change the fact that the last time Mr. Davis walked free in society he placed the life of 20 or 30 people in jeopardy."

■ Assuming that such an interpretation could be put upon argument of Government counsel, the Court is nevertheless of the opinion that its action in overruling the motion for a mistrial upon this ground was correct. While a similar remark was held to be improper in People v. McConahay (1949) 90 Cal.App.2d 596, 203 P.2d 791, cert. den. 338 U.S. 835, 70 S.Ct. 41, 94 L.Ed. 509, the Court is of the opinion no prejudicial harm would have accrued to the defendant therefrom, nor would it have affected the verdict. The dominating question regarding the propriety of argument of Government counsel in criminal prosecutions is whether the argument complained of was so offensive as to deprive the defendant of a fair trial. Isaacs v. United States, (C.A.8, 1962) 301 F.2d 706, cert. den. 371 U.S. 818, 83 S.Ct. 32, 9 L.Ed.2d 58. The Court is of the opinion that the sixth ground asserted by defendant is not sufficient to entitle him to a new trial.

■ The final ground for defendant's motion for new trial is that the Court erred in refusing to charge the jury upon the "Durham rule" of insanity. Defendant submitted a written request for instructions, part of which follows:

> "Furthermore, the defendant should be acquitted if you find that his unlawful acts, those that he is charged and stands trial for today, were caused by, or the product of, a mental disease or mental defect at the time of their commission."

This, the "product test" or "New Hampshire rule", was first enunciated in the federal courts in the case of Durham v. United States, (1954), 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430. This test of legal insanity has been accepted in very few jurisdictions and rejected in many. See 4 A.L.R.2d Later Case Service 1044. Among those jurisdictions declining to adopt the Durham Rule are the Third, Fifth, Eighth, Ninth and Tenth Circuit Courts of Appeals. United States v. Currens, (C.A.3, 1961) 290 F.2d 751; Howard v. United States, (C.A.5, 1956) 232 F.2d 274; Voss v. United States, (C.A.8, 1958) 259 F.2d 699; Black v. United States, (C.A.9, 1959) 269 F.2d 38, cert. den. 361 U.S. 938, 80 S.Ct. 379, 4 L.Ed.2d 357; Wion v. United States, (C.A.10, 1963) 325 F.2d

420, cert. den. 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309. It appears to the Court that, in this Circuit, the test of insanity remains the "M'Naghten Rule" as modified by the "Irresistible Impulse" test. Pollard v. United States, (C.A.6, 1960) 282 F.2d 450, clarified 285 F.2d 81. See also Davis v. United States, (1895) 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499; Davis v. United States, (1897) 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750. Accordingly, the Court is of the opinion that the seventh ground advanced by defendant is without merit.

The Court having the opinion that defendant has advanced no ground upon which a new trial should be granted, an order will enter overruling each ground advanced by defendant and denying a new trial.